# Exhibit A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| SHAREHOLDER REPRESENTATIVE SERVICES LLC, a Colorado limited liability company, | Index No. _____ |
| Plaintiff, | **SUMMONS** |
| v. | |
| SCRIBBLE TECHNOLOGIES, INC., a Canadian corporation; and Does 1 through 20. | |
| Defendants. | |

TO THE ABOVE NAMED DEFENDANT:

     Scribble Technologies, Inc.
     49 Spadina Ave., Suite #303
     Toronto, ON M5V 2J1

     PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED to answer the Complaint of Plaintiff Shareholder Representative Services LLC, and to serve a copy of your answer on Plaintiff at the address indicated below within twenty (20) days after the service of this summons, exclusive of the day of service, or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York.

     YOU ARE FURTHER NOTIFIED THAT should you fail to answer, judgment will be entered against you by default for the relief demanded in the Complaint.

     Plaintiff designates New York County as the place of trial.

1

Dated: March 10, 2017

Respectfully submitted,

**BRAUNHAGEY & BORDEN LLP**

By:   /s/ *J. Noah Hagey*

J. Noah Hagey, Esq.
Andrew Levine, Esq.
Amit Rana, Esq. (*pro hac vice* forthcoming)
BraunHagey & Borden LLP
80 Broad St., Suite 1302
New York, NY 10004
Tel./Fax: (646) 829-9403
hagey@braunhagey.com
levine@braunhagey.com
rana@braunhagey.com

*Counsel for Plaintiff Shareholder
Representative Services LLC*

2

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

| | |
|---|---|
| SHAREHOLDER REPRESENTATIVE SERVICES LLC, a Colorado limited liability company, <br><br>         Plaintiff, <br><br>    v. <br><br> SCRIBBLE TECHNOLOGIES, INC., a Canadian corporation; and Does 1 through 20. <br><br>         Defendants. | Index No. _____ <br><br> **COMPLAINT** |

Plaintiff Shareholder Representative Services LLC, as assignee and in its capacity as duly authorized agent and representative of the former stockholders of Visually, Inc. ("Plaintiff" or "Sellers") brings this action for breach of contract against Defendant Scribble Technologies, Inc. ("Defendant" or "Scribble") (collectively, Plaintiff and Scribble are referred to herein as "Parties"), and alleges as follows:

## INTRODUCTION

1.      Sellers bring this action to secure over $10,000,000 in damages for Defendant Scribble's willful breaches of its obligations under the parties' January 29, 2016 Stock Purchase Agreement (the "Agreement").

2.      Defendant acquired Sellers' former company, Visually, Inc. ("Visually"), in exchange for approximately $20 million in stock. Half of this amount was contingent on Visually's future revenue performance, or "Earnout." To induce the transaction and the Earnout, Defendant covenanted to protect Sellers by using all commercial efforts to support and grow Visually's operations and revenues. Scribble specifically covenanted to implement sales incentive plans and quotas to support the sale of Visually products on the same basis as Scribble's other products.

1

3.      Defendant apparently had no intention of satisfying its obligations.  Almost as soon as the transaction was complete, Defendant began to willfully breach its duties by shuttering Visually's marketing functions, eliminating key staff positions, reducing sales incentives and commissions, and undermining Visually's relationships with key customers.  As a result, Visually's revenues fell dramatically – meaning that the Earnout, representing half of Sellers' purchase consideration, has been squandered.

4.      Having been unable to cause Scribble to resolve this matter in good faith, Sellers bring this action for injunctive and compensatory relief for damages in excess of $10,000,000 and/or distribution and constructive trust of the 2,050,000 Class A Voting Common Shares of Scribble they are owed under the Agreement.

## PARTIES

5.      Plaintiff Shareholder Representative Services LLC ("SRS") is a Colorado limited liability company with its principal place of business in Denver, Colorado.  Pursuant to the Agreement, SRS serves as agent and attorney-in-fact for and on behalf of Visually's selling stockholders (defined as sellers in the Agreement), including to initiate legal proceedings to protect their interests. SRS is also assignee for purposes of collection of all right, title and interest in and to all claims relating to or arising out of the Agreement for Crosslink Bayview VI, LLC; Crosslink Crossover Fund VI, LP; Crosslink Ventures VI, LP; Crosslink Ventures VI-B, LP; Offshore Crosslink Ventures VI Unit Trust; Quest Venture Partners Capital, LLC; and Matt Cooper (the "Assigning Sellers").  The Assigning Sellers together account for the majority of shares held by Visually's selling stockholders.

6.      Defendant Scribble Technologies Inc. is an Ontario, Canada corporation with its principal place of business in Toronto, Canada.  Defendant acquired Visually under the Agreement and was responsible for protecting the Earnout as further detailed below.

## JURISIDICTION AND VENUE

7.      This Court has jurisdiction over Defendant pursuant to CPLR 301 and 302(a), because the State of New York was the location for many of the negotiations and discussions that

2

led to the Agreement from which this action arises and because Defendant transacts business in the State of New York. Additionally, the Parties have agreed that the state and federal courts located in New York, New York have exclusive jurisdiction over any disputes arising out of or relating to the Agreement and have waived any right to object to or contest such forum.

8.      Venue in this Court is proper pursuant to CPLR 503(a) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district. Additionally, the Parties have agreed to venue in this Court and have waived any right to object to or contest laying of venue in this Court.

## FACTUAL BACKGROUND

### A.      VISUALLY'S BUSINESS

9.      Visually (f/k/a Graphcast, Inc.) was founded in 2011 to provide on demand infographic tools to businesses. Visually steadily expanded its product offerings, garnering a dedicated following among its customers and strong interest from investors.  Like many start-ups, Visually offered stock options to its employees to incentivize their investment in the continued success and growth of the company.

10.      Visually generated millions of dollars in revenues selling content on a project-by-project basis to its growing stable of customers.  By 2015, it had over one thousand freelancer designers working to create videos, infographics, ebooks, presentations, web interactions and more for more than 1,000 customers worldwide.

11.      Based on its strong growth and healthy revenues from 2011 to 2015, Visually secured three rounds of funding and raised over $15,000,000 from investors.

#### 1.      Visually's Marketing, Sales, and Customer Success Functions

12.      Visually's platform was based on investments in marketing, sales, and account management / customer support (referred to as customer success or CS).  These critical teams worked together to expand revenues with existing customers (e.g., repeat customers) and book projects with new customers.

3

### a. Marketing

13.     Visually's marketing team promoted the Visually brand and its products to new and existing clients through a variety of marketing channels, including advertising, content marketing, print collateral, events, online agencies, public relations and other marketing programs.  Visually employed both outbound marketing (e.g., advertising, events, print materials) and inbound marketing (e.g., website content, blogs, etc.) to generate sales leads.

14.     Visually used advanced quantitative metrics and data analytics to ensure a seamless marketing to sales process for existing and new customers. The marketing program was critical to the overall success of generating revenue at Visually and the company made substantial investments in the program. For example, in 2015, Visually spent approximately $1.1 million on marketing related expenses.  In detailed financial documents (the "Financial Plan"), which Visually shared with Scribble during the due diligence period, Visually forecasted that in 2016 it would spend nearly $1.5 million on marketing in order to achieve its projected revenues.

### b. Sales

15.     Visually's sales team worked to convert marketing leads into revenue generating sales. In particular, marketing-driven inbound leads made up approximately ninety-five percent (95%) of Visually's sales leads and accounted for a comparable share of bookings and realized revenues from new accounts.

16.     The sales team was directed and incentivized to maximize revenues from both existing and new customers. Sales team members earned commissions based on the revenues generated from their sales, with equal weight given to revenue generated from expanding relationships with existing clients and generating new clients.  As a result, sales representatives were encouraged to drive revenue from all customers regardless of whether there was an existing relationship.

### c. Account Management / Customer Service

17.     As discussed below, the majority of Visually's revenue came from expanding project offerings to existing customers.  In order to ensure existing customer satisfaction and

4

repeat sales, Visually employed a team of strategic account managers and customer success managers. These key personnel worked to maintain relationships with large existing accounts as well as to grow revenue from existing accounts. The strategic account managers worked with the largest, most strategic accounts, such as Oracle, Kia, LinkedIn and others. Their focus was to obtain additional points of contact within an existing client's organization and upsell or cross sell to existing client contacts in order to grow revenues with those clients.  They worked closely with customer success managers, who focused on ensuring that the content and service delivered to customers was flawless.

18.    The diagram below, shared with Scribble during the due diligence period, shows how Visually's marketing, sales, and customer service worked together to retain customers and grow the company's revenues:



### 2.    Visually's Sales and Growth Depended on Expanding Relationships with Existing Customers

19.    Visually sold its services on a project-by-project basis. There were typically no monthly or annual commitments from clients. Therefore, earning expanded revenues from existing customers was critical to Visually's revenue growth.

20.    Visually made investments sufficient to ensure that the marketing team, sales team, and customer success team had the resources necessary for a pipeline of new or expanded sales

5

with existing clients.

21.     In particular, to ensure revenue growth with existing accounts, Visually assigned a strategic account manager as well as a customer success manager to each of its largest one hundred accounts. These personnel worked with their existing contacts within the account and account sponsors to gain new users and to make referrals within existing accounts. The strategy proved successful.  In 2015, Visually earned the majority of its revenue from expanding its product offerings to existing clients.

### B.     VISUALLY EXPLORES OPTIONS TO CONTINUE ITS GROWTH

22.     Through 2015, Visually grew its customer base in large part due to its investment in marketing, sales and customer service. As with most start-ups, to continue its growth, Visually sought additional funding.

23.     In mid-late 2015, Visually engaged in a dual-track fundraising and merger/acquisition process to determine the best approach to take on additional capital to fuel the projected growth in 2016 and beyond.

24.     By late 2015, Visually was engaged in substantive and advanced discussions regarding additional capital or an acquisition with multiple parties, including Defendant Scribble.

### C.     SCRIBBLE'S REPRESENATIONS REGARDING ITS BUSINESS AND PLANS FOR VISUALLY AND THE LOI

25.     Defendant Scribble is a Toronto-based "Software as a Services" (SaaS) technology company founded in 2008 that provides software solutions for business customers.  Unlike Visually, it earns revenues largely through monthly software subscriptions to business customers, often referred to as monthly recurring revenue ("MRR"). On information and belief, prior to the acquisition of Visually, Scribble did not sell products or services on a project-by-project basis.

26.     Unlike Visually, which grew its revenue base by improving its products and marketing them to its existing and new customers, Scribble grew and continues to grow its client base, employee network, and revenues through an aggressive scheme of third party acquisitions. On information and belief, from 2014 through 2016, Defendant Scribble acquired or merged with

seven separate companies.

27.     While Scribble did generate MRR through its ongoing subscription services, it did not provide services to create the content its customers demanded. In late 2015, to meet that need, Scribble entered into discussions to acquire Visually, which specialized in content creation.

### 1.     Scribble's Key Leadership Sold a Healthy Business Run Effectively by Experienced Professionals

28.     On or about December 1, 2015, Scribble's CEO Vince Mifsud travelled to San Francisco, California and presented an investor overview to Visually's board of directors. Mifsud described a growing business with strong relationships with its customers. Mifsud represented, among other things, that Scribble had grown steadily over the prior seven quarters, very high gross margins, a negative net revenue churn rate, and retained over 90% of its clients during the previous seven quarters.

29.     Mifsud's representations painted a rosy picture of Scribble's revenues and growth, which suggested that it had the resources and capabilities to integrate Visually into Scribble's broader product offerings without curtailing the amount of resources that would be available to continue Visually's growth, *i.e.*, its marketing, sales, and customer service.  Indeed, Mifsud represented that post-acquisition Scribble would provide a sustaining investment amount to ensure that Visually had the resources necessary to reach its projected revenue goals for 2016 and beyond.

30.     In or about November and December 2015, Mifsud further represented that key Visually personnel would be retained by Scribble post-acquisition and continue to have leadership roles with respect to the Visually business. For example, Mifsud assured that the Visually CEO would continue to serve as General Manager of Visually and retain responsibility of the Visually profits & loses. Similarly, Mifsud assured that the heads of Visually's sales, marketing, and customer service teams would continue to lead those teams and focus on Visually's products post-acquisition.  The underlying assumption of the acquisition was that Visually would operate as a separate brand within Scribble's product offerings and that both companies would benefit by

7

cross-selling products and integrating platforms.

31.     These representations were a material reason Visually's employees and stockholders agreed to the acquisition. Yet none of them turned out to be true.

### 2.     Based on Scribbles Representations Visually Stopped Discussions With Other Merger/Acquisition Opportunities

32.     Based on Scribble's representations and following a period of negotiations, Scribble submitted to Visually a letter of intent of proposed acquisition, dated December 2, 2016 (the "LOI").

33.     The LOI outlined the basic framework of a transaction that included aggregate consideration of a maximum of 4,100,000 Purchaser Shares to be paid to stockholders of Visually.

34.     Half of these shares (or 2,050,000 Shares) would be paid upon closing with a small holdback. The remaining 50% of the purchase price would be paid as an Earnout in proportion to the amount Visually's revenue exceeded $4,000,000 and up to $7,000,000 for the twelve months from January 15, 2016 to January 15, 2017 ("the Earnout Period").  The Earnout numbers were based on Visually's projected revenues (and projected investment in sales, marketing and customer service) as outlined in the Financial Plan Visually provided to Scribble during the due diligence period.

35.     The Parties recognized that Scribble's continued investment in Visually was necessary to ensure that Visually had the resources necessary to achieve its revenue targets during the Earnout Period.

36.     Based on Mifsud's representations, the structure of the transaction outlined in the LOI, and the mutual understanding of the Financial Plan, Visually ceased discussions with other suitable merger or acquisition partners and continued discussions exclusively with Scribble. These discussions culminated in a Stock Purchase Agreement, dated January 29, 2016.

### D.     THE STOCK PURCHASE AGREEMENT

37.     On January 29, 2016, Scribble, on the one side, and Visually's stockholders, SRS

8

(solely in its capacity as the Sellers' representative) and Visually, on the other side, entered into the Agreement. Consistent with the LOI, the Agreement called for aggregate consideration of 4,100,000 Purchaser Shares (defined as Class A Voting Common Shares in the capital of Scribble), up to 2,050,000 of which to be paid based on achieved revenues during the Earnout Period.

38.     The key provision of the Agreement for the purposes of this dispute is § 2.6(a), which ensured the Sellers that Scribble could not sabotage their right to the Earnout by pulling funding for Visually products or de-incentivizing the sale of Visually's products to its most significant customer base—its existing customers.

39.     Section 2.6(a) provides as follows (emphasis added):

> **2.6    Earnout Period; Earnout Adjustment**
>
> (a)    During the Earnout Period, the Purchaser shall use commercially reasonable efforts to operate the Business within the Company Group with the goal of maximizing the Achieved Revenue, including the implementation of sales incentive plans and quotas to support the Achieved Revenue goals on the same basis as the Purchaser's other products and offerings; provided that the Purchaser shall be entitled to integrate and operate the Business, in each case, within the Company Group, as is necessary to maximize the overall growth and profitability of the Company Group, taken as a whole. The Parties expressly acknowledge that the Purchaser and its Affiliates currently operate a business and, following the Closing, will continue to operate such business and may acquire and/or develop other businesses in the future (which will require the allocation of resources by the Purchaser) and that such actions shall not be deemed to interfere with or impede the ability of the Sellers to earn the Aggregate Earnout Amount.

40.     Scribble knew what Visually had been spending on marketing, sales and customer service in previous years (over $2 million in each of 2014 and 2015) and what it projected it would need to spend to hit its projected revenue goals going forward. The Financial Plan Visually disclosed during the due diligence period showed that Visually expected to spend nearly $1.5 million on personnel, consultants, and other related marketing expenses in 2016 in order to hit its projected revenues. It also showed that Visually planned to nearly double the headcount of its customer success team by the end of 2016. It also planned to double the number of strategic account managers by the end of 2016. The efforts of the customer success managers and strategic account managers were projected to generate significant bookings from existing accounts, equaling 64% of the total for 2016.

9

41.     Indeed, Visually's P&L for 2014 and 2015, which included detailed financial information regarding its expenses were attached as schedules to the Agreement.

42.     The resulting Agreement thus contemplated that during the Earnout Period, Scribble would dedicate resources to the Visually business – consistent with prior representations, the LOI, and the Financial Plan – so as to maximize the Achieved Revenue during the Earnout Period.

43.     The Agreement also contemplated what would occur if Scribble elected not to comply with its obligations to use commercial reasonable efforts vis-à-vis Visually products. Pursuant to Section 2.6(g), Sellers would be entitled to receive 2,050,000 of Class A Voting Common Shares in Scribble if Scribble did not comply with section 2.6(a):

> (g)     Notwithstanding anything to the contrary in this Section 2.6, the Purchaser shall have the right, in its sole and absolute discretion, to elect, by providing notice to the Sellers' Representative, not to comply with any covenant set out in Section 2.6(a), in which case the definition of "Achieved Revenue" shall be $7,000,000, the definition of "Aggregate Earnout Amount" shall be deemed to be 1,681,000 Purchaser Shares, the definition of "Aggregate Earnout Carveout Amount" shall be deemed to be 369,000 Purchaser Shares and the "Earnout Payment Date" shall be deemed to be five Business Days after January 15, 2017.

44.     As discussed below, Scribble reneged on its obligations before the ink on the Agreement was dry.

**E.     SCRIBBLE DISMANTLES VISUALLY'S OPERATIONS AND DESTROYS ITS BUSINESS**

45.     After the parties' acquisition closed, Scribble almost immediately began to disregard its repeated representations to Sellers by jettisoning and removing funding for the core Visually sales and service functions that were necessary to maximize Achieved Revenue during the Earnout Period.

46.     One of the first signs that Scribble would renege on its promises was the abrupt demotion and reassignment of Visually's prior CEO, who had been slated to continue as Visually's acting General Manager.  Instead, he was stripped of any control over the marketing, sales, and customer service functions and reassigned to assist corporate development for Scribble.

10

47.     With Visually's CEO out of the way and its leadership hobbled, Scribble's CEO, Mifsud, took exclusive control over Visually products.  In short order, he systematically stripped the resources previously promised to Visually's marketing, sales, and customer service teams.

48.     Mifsud implemented policies to ensure Visually would not achieve its target revenue during the Earnout Period, thus avoiding Scribble's obligation to pay the Earnout amount to the Sellers.

### 1.     Scribble Dismantles Visually's Marketing Functions

49.     After the businesses were integrated, the former Vice President of Marketing for Visually was assigned to serve as Vice President of the integrated business and was tasked with bringing the Scribble marketing functions up to speed rather than continuing to build the Visually brand. Witnesses stated that Mifsud and other leadership at Scribble directed Visually's key marketing personnel to combine virtually all marketing efforts under the Scribble brand.

50.     In the integrated business, all marketing resources were directed toward Scribble products to make up for years of mismanagement.  For example, according to the former Visually Vice President of Marketing, prior to the acquisition, "Scribble did not have reliable data regarding key marketing metrics.  It had no reliable data for traffic to its website, leads, sales-qualified leads, or pipeline opportunities.  It had no reliable data (and apparently had done minimal analysis) regarding which of its marketing campaigns were effective and which were not. Without reliable data Scribble had no basis on which to build out its marketing operations, no way to know whether it was getting a return on its marketing investment, and no way to make strategic marketing decisions." Exhibit A, ¶ 13. The lack of reliable data was unusual. *Id*. The Visually marketing staff was required to "to spend most, if not all, of our time creating Scribble's marketing function from scratch." *Id*. ¶ 14.

51.     Scribble had attempted to develop its own internal customer relationship management ("CRM") systems, and ultimately abandoned that effort at the recommendation of the former Visually Vice President of Marketing so that Salesforce.com could be implemented.

11

52.     With Visually's marketing team purloined to build Scribble's marketing function from the ground up, marketing for Visually products ground to a halt. As the Vice President of Marketing explained, "All of our time was spent playing building up on Scribble marketing.  The Visually brand suffered as a result." *Id*.

53.     For example, prior to the acquisition, Visually operated a successful and active online blog that drove traffic from existing and new clients to sales representatives. The Vice President of Marketing explained that, Scribble instructed marketing personnel to cease using the Visually blog and "to only post blog content to the Scribble branded blog, which had rarely been updated prior to the acquisition and had very little good content."  *Id*. ¶ 15.  The Scribble blog did not have the same success in conversion to sales.

54.     Prior to the acquisition, Visually generated significant sales leads by attending trade shows including the Adobe Conference and the Marketo Conference. The Vice President of Marketing stated that after the acquisition, "we went to these conference under ScribbleLive branding – Scribble had no prior plans to market itself at these conferences—and that the booth pitched other ScribbleLive products to the prospects."  *Id*. ¶ 16.

55.     On information and belief, post-acquisition Scribble dedicated ***less than twenty percent*** of the marketing spend contemplated in the Financial Plan on Visually related marketing efforts.

56.     These commercially unreasonable efforts decimated Visually's marketing function.  The result was predictable:  lead volume on Visually products dried up and revenues followed suit.

### 2.     Scribble Eliminates Incentives to Sell Visually Products

57.     Just as he had with Visually's marketing function, Mifsud implemented policies and procedures for Visually's sales personnel that took away any incentive to sell to existing customers—which accounted for the majority of Visually's revenues pre-acquisition.

58.     After the acquisition, Mifsud waited months before providing certain sales personnel with a plan that dictated how sales commissions and bonuses would be calculated.

12

Exhibits B, ¶ 11. When Scribble finally announced a plan, it discouraged sales personnel from spending time and energy on sales of Visually products to existing customers. And to add insult to injury, Scribble continually changed the policies and delayed payments to employees selling Visually products. Exhibit C, ¶ 8. Sales bonuses for Visually employees were consistently delayed and the underlying calculations were frequently inaccurate or failed to reflect the signed commission plans.

### a.    The Commission Plan Favored Scribble Sales Over Visually Sales.

59.    The plan provided commissions for sales to *new* accounts, but significantly lower commissions for sales to *existing* accounts. As one sales employee described it, "the sales quota only accounted for sales to new customers. Scribble management instructed sales to focus on outbound leads in order to secure new customers." Exhibit C, ¶ 7.

60.    Accordingly to sales personnel the result was that they were incentivized to sell Scribble products (the majority of which were subscription based sales to new customers) over Visually products (the majority of which were project based sales to repeat customers). This policy clearly breached Scribble's obligation to "implement[] sales incentive plans and quotas to support the Achieved Revenue goals on the same basis as the Purchaser's [Scribble's] other products and offering." Agreement § 2.6(a).

61.    Throughout 2016, Scribble provided several definitions of *new* versus *existing* accounts. Sales personnel found these changes caused confusion and uncertainty. As a Regional Vice President explained, "[m]onths after the acquisition, Scribble's management, led by CEO Vince Mifsud, had still not communicated formal compensation plans to many Visually sales representatives." Exhibit B, ¶ 11.

62.    When the plans were communicated, the same Regional Vice-President of Sales explained that the compensation plans "incentivized personnel to concentrate sales efforts on new clients rather than existing customers." Exhibit B, ¶ 12. The result "was that the sales team focused on new sales at the expense of existing Visually customers . . ." *Id*.

13

63.     The compensation plans damaged client relationships with Visually's large enterprise customers, and revenues from such clients stalled or fell off.

**b.     The Bonus Plan Favored Scribble Sales Over Visually Sales**

64.     Even among sales to existing accounts, Scribble ensured that Visually product sales were not prioritized by implementing a bonus structure that weighed heavily in favor of selling Scribble products over Visually products.  This policy, like the commission policy, violated Scribble's obligations under the Agreement.

65.     For example, Visually employees who had previously focused exclusively on strategic account management stated that they were now expected to spend time on sales to new clients.  This shift had two negative effectives on Visually sales.

66.     First, these account managers could no longer spend as much time developing and cementing relationships with existing clients, from whom the lions' share of Visually revenue came.

67.     Second, the bonus plan for these employees—who were for the first time responsible for closing sales, skewed heavily in favor of sales of Scribble products:  88% of the bonus was keyed to sales of Scribble products, while only 12% was keyed to sales of Visually products. Thus, Scribble sought to further impede Visually revenues by incentivizing sales of Scribble products over Visually products to existing accounts.

**3.     Scribble Prohibits Displays of the Visually Brand**

68.     Scribble also implemented policies and procedures that prohibited the prominent featuring the Visually brand or logo in customer facing documents, presentations, and sales materials. For example, all sales decks were branded by Scribble and deemphasized the Visually brand and products.  As discussed above, Scribble leadership barred the use of the Visually brand at trade shows and shut down further use of the Visually blog, both of which had successfully increased Visually's brand awareness and led to sales generating leads in the past.

14

### 4.    Scribble Eliminates Customer Success and Account Management Roles

69.     Prior to the acquisition, Visually relied on a team of customer success and strategic account managers ("CSMs") to maintain relationships with existing clients (usually large enterprise accounts) and worked hand-in-hand with the sales team to drive new revenue from these existing accounts.

70.     After the acquisition, however, Scribble actively attempted to frustrate these roles, impeding Visually's revenues from large existing accounts.

71.     As discussed above, Scribble forced CSMs to shift focus away from servicing existing clients (their key value-add to Visually's team) and towards explicitly driving renewals from Scribble clients.   More significantly, Scribble all but eliminated the CSM function for Visually products, shifting them almost entirely to Scribble products.  Instead, virtually all customer service for Visually products came from the Scribble customer service model premised on maintaining MRR from subscription customers rather than expanding revenue through additional products to project based customers. This hit Visually's numbers particularly hard because the majority of Visually revenues came from leveraging relationships with existing customers.

72.     Additionally, CSMs stated that they were spread too thin to successfully service clients.  Pre-acquisition, CSMs might be responsible for serving forty separate Visually accounts. Post-acquisition, the few remaining CSMs were responsible for serving as many as one hundred accounts.

### F.    Sellers Have Suffered Damages as a Result of Defendant's Conduct

73.     The central assumption of the Agreement was that Scribble would use commercially reasonable efforts to maximize Visually's Achieved Revenues post acquisition. The Sellers relied on Scribble's commitment to use these efforts, as up to half of their shares in Scribble depended on it.

74.     Notwithstanding its obligations, and its understanding that obtaining the Achieved Revenues required a sustained investment in marketing, sales, and customer service for Visually

15

products, Scribble systematically stripped funding, personnel, and other resources away from Visually and de-incentivized sales of Visually products. The reasons for this misconduct are clear—Scribble wanted to acquire Visually for half-price while exploiting the well-developed Visually resources to expand its own brand and offerings.

75.    The results of Scribble's misconduct and breaches are equally clear. Scribble caused Visually to dramatically miss the Achieved Revenue target of $7 million and deprive the Sellers of half of the value of the purchase price they were promised in selling their company to Scribble.

### G.    Sellers' Good Faith Efforts to Amicably Resolve the Dispute

76.    As the Earnout period progressed, Sellers became aware of Scribble's failure to use commercially reasonable efforts to operate Visually with the goal of maximizing the Achieved Revenues.

77.    On August 31, 2016, Sellers provided notice to Scribble of its failure to fulfill its obligations under the Agreement. Scribble responded through counsel on September 9, 2016 denying its breach of the Agreement.

78.    Sellers provided additional notice on September 23, 2016 of Scribble's failure to use commercially reasonable efforts to operate Visually and requested inspection of document and information to further develop facts supporting its assertion. Scribble responded through counsel on November 11, 2016, again denying any breach and providing certain limited documents and information that failed to address the concerns in Sellers' August 31 and September 23 letters.

79.    Having failed to reach an agreement regarding Scribble's obligations under the Agreement, Sellers are left with no choice but to bring this action to enforce their rights and secure relief for Defendant Scribble's breach of the Agreement.

80.    Sellers seek to recoup millions of dollars in damages and place a constructive trust over the 2,050,000 Class A Voting Common Shares of Scribble they are entitled to under the Agreement.

## CLAIM FOR RELIEF

### BREACH OF CONTRACT

81.     Plaintiff realleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

82.     Sellers and Defendant Scribble entered into the Agreement, a binding and enforceable contract.

83.     Sellers performed all or substantially all of their obligations under the Agreement.

84.     Defendant Scribble breached its obligations to Visually stockholders under the Agreement as alleged above, including without limitation by failing to use commercially reasonable efforts to operate Visually with the goal of maximizing the Achieved Revenues including the implementation of sales incentive plans and quotas to support the Achieved Revenue goals on the same basis as Scribble's other products and offerings.

85.     As a result of Defendant Scribble's willful breaches of the Agreement, Visually stockholders have been damaged in an amount to be proven at trial but in excess of $10,000,000 and lost value of 2,050,000 Class A Voting Common Shares, together with all recoverable costs and interests related thereto.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Shareholder Representative Services LLC on behalf itself and Sellers of Visually, Inc., prays that the Court issue the following relief:

A.     An order adjudging and decreeing that Defendant has engaged in the conduct alleged herein;

B.     Damages in an amount to be proven at trial but estimated to be in excess of $10,000,000.

C.     A declaratory judgment adjudging and decreeing that Sellers are entitled to 2,050,000 Class A Voting Common Shares in Scribble.

D.     A constructive trust over 2,050,000 Class A Voting Common Shares in Scribble and an order enjoining Scribble from transferring, selling, encumbering, or otherwise disposing of

17

such shares or entering into any agreement or understanding, written or oral, regarding such shares.

     E.     Pre- and post- judgement interest at the lawful rate.

     F.     All allowable attorneys' fees and costs.

     G.     All such other and further relief as the Court may deem just, proper, and equitable.

Dated: March 10, 2017          Respectfully submitted,

**BRAUNHAGEY & BORDEN LLP**

By:    */s/ J. Noah Hagey*     

J. Noah Hagey, Esq.
Andrew Levine, Esq.
Amit Rana, Esq. (*pro hac vice* forthcoming)
BraunHagey & Borden LLP
80 Broad St., Suite 1302
New York, NY 10004
Tel./Fax: (646) 829-9403
hagey@braunhagey.com
levine@braunhagey.com
rana@braunhagey.com

*Counsel for Plaintiff Shareholder*
*Representative Services LLC*

18

# EXHIBIT A

SUPREME COURT FOR THE STATE OF NEW YORK
COUNTY OF NEW YORK

SHAREHOLDER REPRESENTATIVE
SERVICES LLC, a Colorado limited liability
company,

                    Plaintiff,

      v.

SCRIBBLE TECHNOLOGIES, INC., a Canadian
corporation; and Does 1 through 20.

                Defendants.

**AFFIDAVIT OF URAL CEBECI**

I, Ural Cebeci, affirm the following under penalties of perjury:

1.     I am currently the Senior Vice President of Marketing at Testlio. From April 2015 through January 2016, I was Vice President of Marketing at Visually, Inc. ("Visually"). When Visually was acquired by Scribble Technologies Inc. ("Scribble") in January 2016, I became the Vice President of Marketing for Scribble, a role in which I remained until October 2016. Previously I held senior marketing roles at Microsoft, Skype, and Optimizely, an internet marketing startup.

2.     I have a Master of Business Administration from The Wharton School of the University of Pennsylvania, a Master of Sciences degree in Electrical Engineering from Stanford University, and a Bachelor of Sciences degree in Electrical Engineering from Middle East Technical University in Ankara, Turkey.

3.     If called as a witness, I could and would testify competently to the facts stated herein.

**A.    Visually's Marketing**

4.     In April 2015, I joined Visually, which provides on demand visual content to businesses, to help build and scale its marketing team. As the Vice President of Marketing, I led

the company's marketing efforts and supervised a team of approximately six employees. I reported directly to the CEO and managed the end-to-end marketing to sales process.

5.      Our marketing team worked hard to grow and elevate Visually's brand.

6.      Using blogs, ebooks and webinars, Visually's marketing team published content to raise awareness of Visually's brand and drive new demand.  Visually's in-house brand designer constantly updated Visually's website and marketing print materials.  Visually's head of marketing operations tracked these marketing efforts to make sure our efforts were working as well as running demand generation programs.  Visually's two marketing associates worked collaboratively with other team members to execute the company's marketing strategy including PR, analyst relations, search engine optimization. We participated in industry trade shows and digital marketing conferences, including the Adobe Digital Marketing Conference, one of the premier events for digital marketing professionals, and the Marketo Marketing Nation Summit and Content Marketing World, two of the premier industry events for digital and content marketing professionals.

7.      To support these activities, Visually made significant investments in marketing. In 2015, for example, Visually spent a significant amount on marketing programs alone, including on software services such as Salesforce.com and Marketo, which are industry standard services that support and enhance a company's marketing function.  This was in addition to the compensation Visually paid its marketing team or to its outside marketing consultants.

8.      A big part of my job at Visually was to track and analyze the company's marketing efforts to ensure that our resources were well spent and to identify which programs were successfully driving sales leads for the company.  To do this, Visually, like all of the companies I had previously worked at, used quantitative metrics and data analytics to track traffic to Visually's website, blogs and webinars.  We closely tracked and analyzed marketing leads, sales qualified leads, and Visually's project pipeline.  I also looked at which marketing campaigns were successful at generating revenues for the company by looking at Visually's spend on various outlets (*e.g.* at trade shows or via GoogleAds) and the return on those investments.

9.      As a result of our marketing investments and smart use of data and quantifiable

metrics to focus our efforts on programs that worked, over 95% of Visually's revenue came from

marketing-driven leads—leads generated from Visually's blog, webinars, and social media

campaigns, events and search engines—from both new and existing Visually customers.   We

built a brand that was well-recognized in the industry.

### B.      Scribble's Marketing

10.      In January 2016, Visually was acquired by Scribble. After the acquisition, I

became Vice President of Marketing for Scribble and reported directly to Chief Executive Officer,

Vince Mifsud.

11.      Before the acquisition I was led to believe that Visually (and its marketing team)

would continue to operate independently and that I would continue to be responsible for directing

marketing for Visually's products.

12.       After the acquisition, we have been directed to focus on the overall Scribble

brand. My team's focus shifted from Visually to the larger brand and many other products that

live under it. As I transitioned to working on marketing for Scribble it became clear to me that

Scribble did not have some of the most basic marketing functions in place.

13.      For example, Scribble did not have reliable data regarding key marketing metrics.

It had no reliable data for traffic to its website, leads, sales-qualified leads, or pipeline

opportunities.  It had no reliable data (and apparently had done minimal analysis) regarding which

of its marketing campaigns were effective and which were not.  Without reliable data Scribble had

no basis on which to build out its marketing operations, no way to know whether it was getting a

return on its marketing investment, and no way to make strategic marketing decisions. Based on

my years of experience in marketing, this lack of reliable data was unusual.

14.      As a result, Scribble's marketing efforts were haphazard and ineffective.  Its brand

was not strong.  Once I was transferred from Visually marketing to head Scribble's marketing, I

and my marketing team were required to spend most, if not all, of our time creating Scribble's

marketing function from scratch.  We not only had to compile data that we could trust, but we had

to rebuild Scribble's website and rebrand the company. We also started to build product marketing content, do PR and build relationships with key analysts.   As a result, we were not able devote the time and effort necessary to leverage the Visually brand or promote Visually products. All of our time was spent playing building up on Scribble marketing.  The Visually brand suffered as a result.

15.     For example, prior to the acquisition, Visually maintained an active online blog that was successful in driving traffic from existing and new clients to Visually's sales representatives. After the acquisition, we dismantled the Visually blog to only post blog content to the Scribble branded blog, which had rarely been updated prior to the acquisition and had very little good content.

16.     Prior to the acquisition, Visually was successful in obtaining sales generating leads by attending trade shows including the Adobe and Marketo conferences. After the acquisition, we went to these conferences under ScribbleLive branding—Scribble had no prior plans to market itself at these conferences—and that the booth featured the Scribble brand only and the sales people representing us at the booth pitched other ScribbleLive products to the prospects.

17.     The marketing function at Scribble was further hampered by, in my experience, a higher than normal attrition rate at Scribble.  This attrition was not limited to marketing employees.  The morale in the company was extremely low. While I was at Scribble, it was not unusual to lose two to four employees in a single week.

18.     In October 2016, I resigned my position as Vice President of Marketing for Scribble.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

Dated: March 10, 2017

_Ural Cebeci_

Ural Cebeci

# EXHIBIT B

SUPREME COURT FOR THE STATE OF NEW YORK
COUNTY OF NEW YORK

SHAREHOLDER REPRESENTATIVE
SERVICES LLC, a Colorado limited liability
company,

                Plaintiff,

    v.

SCRIBBLE TECHNOLOGIES, INC., a Canadian
corporation; and Does 1 through 20.

                Defendants.

**AFFIDAVIT OF BRADLEY JOE**

I, Bradley Joe, affirm the following under penalties of perjury:

1.     From December 2015 through January 2016, I was a Regional Vice President for Sales at Visually, Inc. ("Visually"). When Visually was acquired by Scribble Technologies Inc. ("Scribble") in January 2016, I continued to serve as Regional Vice President for Sales, a role in which I remained until March 2016. Previously, I have held sales, marketing, and business development roles at Elance-oDesk, oDesk, and Webmarketing123.

2.     I hold a Bachelor of Arts degree in economics and political science from the University of California, Irvine.

3.     If called as a witness, I could and would testify competently to the facts stated herein.

**A.    Visually's Sales Team and Compensation**

4.     As Director of Sales Operations at Visually, I directed sales in my region and managed eight to ten sales employees. The sales team worked to generate sales from new customers as well as expand sales to existing customers. We worked very closely with the marketing team and the customer success managers to ensure a successful and diversified sales pipeline.

1

5.       For example, while at Visually I had one on one meetings with the Vice President of Marketing on a weekly basis. I also had regular meetings with the Director of Customer Success, which was the team that worked to maintain and build relationships with existing Visually customers. This collaboration among the sales, marketing and customer success teams was a big part of Visually's success.  We each knew what the other teams were doing and worked together to drive revenue at the company, a significant portion of which came from expanding sales to existing customers.

6.       Compensation for the sales team included a base salary plus a variable bonus based on individual sales quotas. The quotas treated sales to new or existing customers on an equal basis.  All sales counted, so we were encouraged to both seek new customers and expand sales to existing customers. The compensation structure was clearly communicated to me and other sales related personnel.

**B.       Scribble's Sales Functions and Compensation**

7.       I became Regional Vice President of Sales for the West Coast region when Scribble acquired Visually in January 2016. I worked with others to attempt to integrate the sales teams at Visually and Scribble including from a people, process, and technology standpoint. I reported directly to Scribble Chief Executive Officer, Vince Mifsud, who told me that sales personnel would be able to cross-sell both Scribble and Visually products to new and existing customers.

8.       After the acquisition, however, the company's focus was on selling Scribble products and selling products to new customers. Visually sales took a back seat.

9.       For example, shortly after the acquisition, many members of the Visually sales team travelled to Toronto for training on Scribble products but to my knowledge there was no centralized or dedicated training provided to Scribble personnel in a similar fashion on Visually products.  The focus was always on how to sell Scribble products.

10.       Prior to the acquisition, Scribble, which is based in Toronto, had a limited sales presence on West Coast of United States.  To my knowledge, Scribble did not transfer or hire any

new sales personnel to join the Visually team on the west coast. This meant that the Visually team already in place had less time to spend promoting and selling Visually products, especially given the management's focus on Scribble products.

11.    Whereas the sales compensation structure at Visually was transpiration, the compensation plans at Scribble were constantly changing and poorly communicated. Months after the acquisition, Scribble's management, led by CEO Vince Mifsud, had still not communicated formal compensation plans to many of Visually sales representatives.

12.    When compensations plans were explained, often not with great clarity or consistency, they incentivized personnel to concentrate on sales efforts to new clients rather than existing customers. Virtually all iterations of the sales compensation plans counted only sales to new clients for compensation quota purposes. The result was that the sales team focused on new sales at the expense of existing Visually customers, who had been key revenue generators for the company. Expanded sales to these existing large customers dried up. I resigned my position with Scribble in March 2016.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

Dated: _March 9 2017_          _Bradley J_
                                Bradley Joe

4

# EXHIBIT C

SUPREME COURT FOR THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

SHAREHOLDER REPRESENTATIVE
SERVICES LLC, a Colorado limited liability
company,

               Plaintiff,

   v.

SCRIBBLE TECHNOLOGIES, INC., a Canadian
corporation; and Does 1 through 20.

               Defendants.

---

**AFFIDAVIT OF KELLEY L. MILLER**

    I, Kelley L. Miller, affirm the following under penalties of perjury:

    1.    I am over the age of 18 years and am, in all respects, competent to make this Declaration. From July 2015 through January 2016, I was a Strategic Account Manager at Visually, Inc. ("Visually"). When Visually was acquired by Scribble Technologies Inc. ("Scribble") in January 2016, I worked as a Sales Executive at the combined company, a role in which I remained until November 2016. Previously I have held account management and strategy roles at Madison+Main, Taboola and LifeAt.

    2.    If called as a witness, I could and would testify competently to the facts stated herein.

    3.    I joined Visually in July 2015 as a Strategic Account Manager, a sales position. I focused on selling Visually's infographic tools to new and existing accounts.  Sales to existing accounts made up a large part of Visually's revenues.  Once a client had used Visually for a particular project, they were often interested in working with us again.

    4.    My compensation at Visually was a combination of base salary and a bonus based on sales I generated.   I had a sales quota to meet as did all of the account managers.  The quotas

treated sales to new or existing customers on an equal basis. This meant that I could follow the most promising leads without thinking about whether they would count toward my quota. Often that meant working with existing customers to sell new projects to them.

5.    A lot of my sales opportunities were generated from inbound sales leads from existing customers and new customers responding to the work of Visually's marketing and customer service teams. Marketing helped create strong brand awareness through Visually's blog, website, webinars. Client Success helped create lasting relationships with existing customers. This made my job easier. I personally secured sales to several large existing clients through inbound leads while at Visually.

6.    My role changed when Visually was acquired by Scribble in January 2016. At Visually I was encouraged to generate sales with both new and existing clients. At Scribble, I was directed and incentivized to focus primarily on sales to new clients.

7.    These incentives were built into the compensation plans at Scribble, which seemed to change frequently. While my compensation was a mix of base salary, commission and a bonus based on my hitting a sales quota, the sales quota only accounted for sales to new customers. Scribble management instructed sales to focus on outbound leads in order to secure new customers.

8.    There were also issues around payment of bonuses to Visually sales personnel at Scribble. The compensation plans at Scribble were unclear and frequently changed. I had to fight to receive the compensation that I was owed based on contract. For example, after the end of a sales quarter, Scribble's Chief Executive Officer, Vince Mifsud, would attempt to retroactively change the compensation plan to reduce or altogether erase compensation payments for Visually sales. I personally had issues getting management to fully compensate me for bonus payments for the first two quarters in 2016.

9.    In November 2016, I resigned my position with Scribble.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.

Dated: 03/10/17
              Kelley                           L. Miller